FILED
U.S. DISTRICT COURT

2009 MAY -8 P 4: 05

DISTRICT OF UTAH

BY:
DEPUTY CLERK

DAVID M. BENNION (5664)
SCOTT S. BELL (10184)
PARSONS BEHLE & LATIMER
One Utah Center
201 South Main Street, Suite 1800
Post Office Box 45898
Salt Lake City, UT  84145-0898
Telephone: (801) 532-1234
Facsimile: (801) 536-6111

ERIC J. AMDURSKY (*pro hac vice* application pending)
PETE SNOW (*pro hac vice* application pending)
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, California 94010
Telephone (650) 473-2600
Facsimile (650) 473-2601

*Attorneys for Plaintiff Fusion Multisystems, Inc. d/b/a Fusion-io*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT COURT OF UTAH

| | |
|---|---|
| FUSION MULTISYSTEMS, INC., a Nevada corporation,<br><br>     Plaintiff,<br><br>vs.<br><br>DONALD G. BASILE, an individual,<br><br>     Defendant. | **COMPLAINT**<br><br>Case: 2:09cv00426<br>Assigned To : Greene, J. Thomas<br>Assign. Date : 5/8/2009<br>Description: Fusion Multisystems v. Basile |

Plaintiff Fusion Multisystems, Inc., d/b/a Fusion-io ("Fusion-io"), by and through its

counsel and, in support of its claims for relief against defendant Donald G. Basile ("Basile"),

alleges as follows:

## INTRODUCTION

1.     Fusion-io brings this action to protect its confidential, proprietary and trade secret information and materials ("Confidential Information") from being unlawfully misappropriated by its former Chief Executive Officer, defendant Donald G. Basile.  Since Fusion-io terminated Basile's employment on or about February 23, 2009, Fusion-io has made numerous oral and written demands that Basile return to Fusion-io all of its property in his possession, including, among other property, a proprietary ioSAN prototype card developed by Fusion-io (the "ioSAN Prototype Card"), Basile's company-related e-mails, and all of Fusion-io's Confidential Information in Basile's possession, custody and control.  Basile's failure to return Fusion-io's property and Confidential Information constitutes a breach of his Employment Agreement and Proprietary Information and Invention Assignment Agreement with Fusion-io.

2.     Basile's refusal to return the Company's property and Confidential Information presents immediate risk of significant damage to Fusion-io, especially in light of its recent discovery of evidence that Basile has secretly been named the new Chief Executive Officer of Violin Memory, Inc. ("Violin Memory"), a director competitor of Fusion-io.

3.     Through this action, Fusion-io seeks provisional injunctive relief to (a) prevent Basile from using or disclosing Fusion-io's property or Confidential Information; (b) prevent Basile from working for Violin Memory in any capacity on the grounds that he has misappropriated Fusion-io's Confidential Information for use in the performance of his duties for Violin Memory; (c) require Basile to comply with his continuing obligations to Fusion-io, including but not limited to his obligations not to solicit Fusion-io employees to terminate their

employment with Fusion-io and not to disparage Fusion-io; (d) require Basile to return all Fusion-io property including, among other property, the ioSAN Prototype Card, Basile's company-related e-mails, and all of Fusion-io's Confidential Information in Basile's possession, custody and control; and (e) prevent Basile from deleting or destroying any Fusion-io property or Confidential Information before returning it to Fusion-io.

## THE PARTIES

4.      Fusion-io is a Nevada corporation with its headquarters in Salt Lake City, Utah. Fusion-io maintains its principal place of business at 6350 South 3000 East 6th Floor, Salt Lake City, UT 84121. Basile worked out of this office during the time that he was employed by Fusion-io.

5.      Basile is an individual who was hired by Fusion-io to be its CEO on or about February 1, 2008. Fusion-io terminated Basile as of February 23, 2009. Fusion-io is informed and believes, and on that basis alleges, that Basile resides in Salt Lake City, Utah.

6.      Basile is subject to jurisdiction in this Court.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over Fusion-io's claims under the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq.*, and under 28 U.S.C. § 1331 (the "CFAA"). Supplemental jurisdiction is appropriate over Fusion-io's state law claims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events that gave rise to Fusion-io's claims took place within the District, Basile's tortious

conduct was directed at this District, and because Fusion-io was injured by Basile's tortious conduct committed in this District.

9.    Basile and Fusion-io entered into an Amended and Restated Employment Agreement as of December 31, 2008 (a copy of which is attached to this Complaint as Exhibit A) (the "Employment Agreement"), which requires the arbitration of claims for damages, but allows the parties to seek provisional injunctive relief in any court of competent jurisdiction. (Ex. A at ¶ 25.) Concurrently with the filing of this Complaint, Fusion-io is submitting a demand for arbitration on its claims for damages and permanent injunctive relief in accordance with the terms of the Employment Agreement. This Court retains jurisdiction over the claims for provisional injunctive relief sought herein, however, pursuant to paragraph 25(d) of the Employment Agreement, which states that either party may file "any action for provisional injunctive relief in any court of competent jurisdiction to prevent immediate and irreparable harm and to ensure that the relief sought by the aggrieved party is not rendered ineffectual pending the arbitration."

## GENERAL ALLEGATIONS

10.    Fusion-io is a privately-held company that was founded in or about June 2006. Fusion-io is a leading provider of enterprise solid-state technology and high-performance input/output ("I/O") solutions that enable computer systems to access vast amounts of data at extremely quick rates. Fusion-io's solid state drives give customers greatly enhanced performance at a fraction of the cost of traditional disk-based storage systems.

Fusion's Intellectual Property

11.    A solid state storage ("SSS") device is a device that stores data for a computer system. A typical SSS device is a collection of NAND flash chips combined with a controller and interface. Flash chips are commonly used in digital cameras, iPhones, and USB drives – they are, for example, the storage device on which pictures are stored in the camera. In conceptual terms, an SSS device is what you would get by taking the flash chips out of dozens (or even hundreds) of digital cameras and tying them all together.

12.    SSS devices can be used in any computer system, but—due to the cost—they are used more frequently in servers than personal computers. Although Fusion-io also produces high-end consumer level SSS devices, its focus is on enterprise-based solutions for entities with a need to access stored information at a high rate of speed. Fusion-io's enterprise customers include, for example, Hill Air Force Base in northern Utah.

13.    SSS devices bridge a gap in performance that exists in traditional computer systems when data is transferred between the data storage device and the computer's memory. In a traditional computer system, data (such as pictures, music, or computer programs) is stored on a mechanical hard disk. In conceptual terms, a mechanical hard disk is similar to a vinyl record: it has a spinning disk with an arm that moves back and forth to read information from the different parts of the disk. A mechanical hard disk spins much faster than a record – generally between 5,400 and 10,000 rotations per minute, compared with 33 rotations per minute for a 12-inch album or 45 rotations per minute for a 7-inch single. Yet the basic technology is the same. Even with improvements in speed, advancements in this technology (which is more

than fifty years old) have not kept pace with improvements to the processing power of computers: modern computers can process information at a significantly higher speed than they can obtain it from a mechanical hard disk.

14.     In order to process information, a computer first copies it from the hard disk into random access memory, called "RAM" or "memory" for short. There are different types of RAM, one of the most commonly used being DRAM (or dynamic random access memory). Once information is copied from the hard disk into memory, the computer is able to process it quickly because, unlike the hard disk, RAM has no moving parts. The same information must repeatedly be copied from the hard disk to RAM, however, because (1) RAM is "volatile," meaning that it does not retain data when the computer is powered down; and (2) hard disks typically have a much larger storage capacity than RAM, so information is moved in and out of RAM from the hard disks on an as-needed basis.

15.     An SSS device solves the problem created by the slow access speed of the mechanical hard disk and the RAM's volatile nature and limited storage capacity. Like a traditional hard disk, an SSS device is non-volatile, so it retains information when the computer is off, and is capable of storing large amounts of data. Unlike a traditional hard disk, however, an SSS device has no moving parts. Thus, it achieves a much higher rate of data transfer that is closer to that used by the RAM. The result is that Fusion-io's SSS solutions store massive amounts of data and transfer that data at near-memory speeds, *with 100 times the capacity density of* DRAM and 10 times the capacity per dollar of DRAM.

16.     The market opportunity for SSS technology is enormous.  Although there are other providers of SSS drives, Fusion-io has used unique and proprietary designs and architecture to produce a product that writes (i.e., stores data) as rapidly and efficiently as it reads (i.e., accesses data).  The products of Fusion-io's competitors write significantly slower than they read.  Customers from around the world have described Fusion-io's technology, in particular, as "Game Changing."  That is the result of a significant investment of time and money by Fusion-io in developing new technologies.  To create these technologies, Fusion-io has not only designed new hardware products but also employs numerous software programmers in drafting proprietary computer code that enables Fusion-io to get the best possible performance from its products.

17.     Not surprisingly, Fusion-io's most valuable property is its intellectual property.  Its greatest assets are not the physical SSS devices and other materials the company owns.  Instead, Fusion-io derives most of its value from the technical knowledge needed to create SSS, software, and other products and incorporate them into enterprise-based business solutions for public and private business customers, such as Network Attached Storage ("NAS") or Storage Array Network ("SAN") systems.  Fusion-io has a broad range of intellectual property that includes trade secrets, trademarks, copyrighted software code, and approximately 40 filed patents -- many of them not yet public information.

18.     Although Fusion-io is a relatively new company, it is a rapidly growing and highly successful one.  At the time that Basile began working for Fusion-io, the Company had approximately eight employees.  A little more than a year later, Fusion-io has grown to

approximately one hundred thirty employees.  Fusion-io's customer base has grown to include hundreds of large, institutional customers.  In addition to military customers like Hill Air Force Base, Fusion-io has sales arrangements with leading computer manufacturers including I.B.M., Dell, and Hewlett-Packard.  Fusion-io's chief scientist is Steve Wozniak, who co-founded Apple with Steve Jobs.  As a result of a significant monetary investment and the efforts of highly-skilled and experienced employees, Fusion-io has quickly become a market leader in the highly specialized area of enterprise SSS solutions.   As such, Fusion-io has developed extraordinarily valuable intellectual property, including trade secret information that is vital to its continued success.

<u>Basile's Employment With Fusion And<br>Fusion's Efforts To Protect Its Intellectual Property</u>

19.     Defendant Donald G. Basile joined Fusion-io as its Chief Executive Officer on or about February 1, 2008.  As CEO of Fusion-io, Basile necessarily was at the forefront of every aspect of Fusion-io's business.  Basile had access to all of Fusion-io's technical data, its business plans, and its sales information.  Basile obtained that information because of the position of trust he held with Fusion-io as its highest-ranking officer and employee and, as such, he had a duty to use that information only for Fusion-io's benefit.  On information and belief, Basile holds a Ph.D. in engineering from Stanford University and, accordingly, Basile understands the technology behind Fusion-io's products.  And as CEO, Basile was intimately familiar with the business side of the Company as well.

20.    In addition to the obligations imposed by law, Fusion-io has implemented numerous precautions to protect its trade secrets. First and foremost, Fusion-io requires each of its employees to sign the company's Proprietary Information and Inventions Assignment Agreement ("PIIA"). Fusion-io and Basile entered into a PIIA on or about March 13, 2008 (a copy of which is attached to this Complaint as Exhibit B). The PIIA states that it is part of the consideration for Basile's employment and is effective as of his first date of employment, February 1, 2008. The PIIA contains the following provisions that are relevant to this action:

> **Company and Third Party Information.**  I agree that at all times during the term of my employment and thereafter, to hold in strictest of confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation without written authorization of the Board of Directors of the Company, any Confidential Information of the Company.  I understand that "Confidential Information" means any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, information relating to products, services, software, research, developments, technology, hardware configuration information, marketing, finances or other business information disclosed to me by the Company either directly or indirectly in writing, orally or by drawings or observation of parts or equipment.

(Ex. B at ¶ 2(a).)

> **RETURNING COMPANY DOCUMENTS.**  I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by me pursuant to my employment with the Company or otherwise belonging to the Company, its successors or assigns.

(Ex. B at ¶ 5.)

> **SOLICITATION OF EMPLOYEES OR CUSTOMERS.**  For a period of twelve (12) months following the date Employee ceases to be employed by the Company for any reason, Employee, directly or indirectly, will not: (i) solicit, induce, influence or encourage any person to leave employment with the Company or its resellers or distributors or (ii) harass or disparage the Company or its employees, clients, directors or agents.  For a period of twelve (12) months following the date Employee ceases to be employed by the Company for any reason, Employee, directly or indirectly, will not solicit any of the Company's

customers or users who were customers or users at any time during Employee's employment with the Company.

(Ex. B at ¶ 6.)

> **LEGAL AND EQUITABLE REMEDIES.** Because my services are personal and unique and because I may have access to and become acquainted with the Confidential Information of the Company, the Company shall have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that the Company may have for a breach of this Agreement.

(Ex. B at ¶ 9.)

> **Survival.** The provisions of this Agreement shall survive the termination of my employment and the assignment of this Agreement by the Company to any successor in interest or other assignee.

(Ex. B at ¶ 11(b).)

      21.    On or about December 31, 2008, Fusion-io and Basile entered into the

Employment Agreement, which provided further protections for the company's Confidential

Information. (Ex. A.) The Employment Agreement contains the following provisions that are

relevant to this action:

> **NONSOLICITATION/NONDISPARAGEMENT.**    In the event of the termination of Executive's employment for any reason, Executive shall not, for a period of twelve (12) months, directly or indirectly:
>
> (a) solicit, induce or encourage any employee of the Company or any of its affiliates or subsidiaries to terminate their employment with the Company or any of its affiliates or subsidiaries;
>
> (b) make any derogatory public statement concerning the financial performance, products, services, the Board or management personnel of the Company or any of its affiliates or subsidiaries, or Executive's employment; or
>
> (c) use or disclose the Company's Confidential Information to induce, attempt to induce or knowingly encourage any Customer of the Company or any of its affiliates or subsidiaries to divert any business or income from the Company or any of its affiliates or subsidiaries, or to stop or alter the manner in which they are then doing business with the Company or any of its affiliates or subsidiaries.

(Ex. A at ¶ 10.)

>**PROPRIETARY INFORMATION AND INVENTION ASSIGNMENT AGREEMENT.** During the term of this Agreement and at all relevant times thereafter, and as a condition to the receipt of any severance benefits hereunder, Executive agrees to abide and be bound by the terms of a proprietary information and invention assignment agreement entered into by the Company and Executive (the **"Proprietary Information and Assignment Agreement"**).

(Ex. A at ¶ 12.)

>**INJUNCTIVE RELIEF.**   Executive agrees that it would be difficult or impossible to measure the damage to the Company from any breach by Executive of the covenants set forth in Sections 10, 11 or 12 of this Agreement; that damages to the Company for any such injury would therefore be an inadequate remedy for any such breach, and that such breach would cause irreparable harm to the Company. Executive agrees that in the event of a breach of the terms of any such Section, upon satisfaction of the applicable legal requirements and prerequisites, the Company shall be entitled, in addition to and without limitation upon all other remedies the Company may have, to injunctive or other appropriate equitable relief to restrain any such breach.

(Ex. A at ¶ 13.)

22.     In addition to these contractual protections, Fusion-io also takes physical and technological precautions to safeguard its intellectual property.   Fusion-io's trade secret information (including but not limited to its e-mail and electronic document storage systems) are stored on computer servers in a room referred to as the "Data Center" in its headquarters. Physical access to the Data Center is restricted to employees with a legitimate need to enter it, all of whom have signed PIIAs. The Data Center is protected by a locked door that requires both an electronic key fob and the fingerprint of an authorized employee to open.   Once inside the Data Center, access to the servers still requires a password.  Fusion-io's servers can be accessed remotely by employees using only a password, albeit to a much more limited extent.   Each

employee's password gives that employee only that access necessary for the employee to do his or her job (to take an obvious example, an employee can access his or her own e-mail, but not the e-mail of other employees).  Thus, Fusion-io limits employees' access to its proprietary, trade secret information to the greatest extent practicable using contractual, physical, and technological means.

Basile's Termination And<br>Refusal To Comply With Requests To Return Fusion's Intellectual Property

23.     On February 23, 2009, Fusion-io's Board of Directors met with Basile and terminated his employment, effective as of the same day.  Basile was terminated for reasons that amount to a termination for "Cause" under his Employment Agreement.

24.     Fusion-io has further discovered that, while Basile was still employed by Fusion-io, he caused all of his e-mail to be erased automatically from Fusion-io's servers on an ongoing basis.  Specifically, with respect to Basile's incoming e-mail (i.e., e-mail sent to Basile), Basile caused all of his e-mails to be forwarded from his Fusion-io e-mail account, dbasile@fusionio.com, to his own personal e-mail account, don.basile@stanfordalumni.org. Using Fusion-io's e-mail servers, there were two ways of accomplishing that.  The first method of forwarding e-mail is to "store-and-forward."  Under this method, the original e-mail would be retained on Fusion-io's e-mail servers (i.e., stored) and an identical copy of the e-mail would be sent automatically to another e-mail address (i.e., forwarded).  The second method of forwarding e-mail is to "forward only."  Under that method, the e-mail is forwarded directly to another e-mail address, and no copy is kept on Fusion-io's servers.  Basile set up his Fusion-io e-mail

account to forward his e-mails to his personal e-mail account which, by default, would have occurred using the "store-and-forward" method. Shortly after Basile was hired as CEO, however, Basile caused his e-mails to be forwarded to his personal e-mail address using the "forward only" method so that no copy of his e-mails would be kept on Fusion-io's servers.

25.     With respect to Basile's outgoing e-mail (i.e. e-mail Basile sent to others), Basile similarly took actions to prevent Fusion-io from retaining a copy. By default, a copy of all outgoing e-mail from any Fusion-io e-mail account would be kept on Fusion-io's servers at the time it was sent. Although Basile sent some e-mails from his Fusion-io e-mail account, Basile more often sent e-mails from his personal e-mail account. Because those e-mails never travelled through Fusion-io's servers, Fusion-io could not make any copy of those e-mails. Significantly, Basile hid the fact that his e-mails were not going through Fusion-io's servers by configuring his personal e-mail address to make e-mail appear as if it was being sent from his Fusion-io e-mail address. In other words, a recipient of an e-mail from Basile would see, in the "from" line, "dbasile@fusionio.com" – even though, in fact, the e-mail was sent from his personal e-mail account and never went through Fusion-io's servers. If the recipient replied to the e-mail, the reply would be sent to Basile's Fusion-io address (just as if Basile's e-mail had originated from that address). Because of the "forward only" protocol Basile put in place, however, such a reply e-mail would be forwarded automatically to Basile's personal e-mail address (and no copy would be stored on Fusion-io's servers) as described in the paragraph above.

26.     Basile remains in possession of electronic and/or physical documents incorporating Fusion-io's proprietary, trade secret information, including but not limited to e-mails Basile sent or received during his employment with Fusion-io.

27.     The trade secret information to which Basile was given access during his employment, and which he has now misappropriated, includes both technical and business information. As described above, Fusion-io's business of providing enterprise SSS solutions is a highly specialized area of computer hardware and software design, and Basile, as CEO of Fusion-io, had access to Fusion-io's trade secret technical information. Basile also had access, however, to all of Fusion-io's trade secret business information. That information includes, but is not limited to:

   (a)     Trade secret information regarding Fusion-io's customers, including the identities of Fusion-io's customers, the identities of decision-making employees of Fusion-io's customers, the products and services that Fusion-io's customers have purchased from it, details regarding pricing that such customers have paid for Fusion-io's products and services, details regarding customer support provided by Fusion-io to such customers, the identities of Fusion-io's key customers and financial details of its relationships with them, and other information regarding the nature and duration of Fusion-io's relationships with such customers;

   (b)     Trade secret information regarding Fusion-io's potential customers, including the identities of Fusion-io's most sought-after potential customers, the identities of employees of Fusion-io's potential customers with whom Fusion-io has had

contact, the products and services that Fusion-io has attempted to sell to potential customers, and details regarding pricing terms that Fusion-io has offered to potential customers;

   (c) Trade secret information regarding Fusion-io's vendors, including the identities of Fusion-io's vendors, the products that Fusion-io has purchased from vendors, details regarding pricing that Fusion-io has paid to its vendors, and other information regarding the nature and duration of Fusion-io's relationships with vendors;

   (d) Trade secret information regarding Fusion-io's investors, including the identities of Fusion-io's investors, the identities of decision-making employees of Fusion-io's investors, the monetary amount that Fusion-io's investors have invested in the Company, the amount of stock that Fusion-io's investors have received, the non-monetary terms to which Fusion-io agreed in connection with the investments, and other information regarding the nature and duration of Fusion-io's relationships with its investors;

   (e) Trade secret information regarding Fusion-io's potential investors, including the identities of Fusion-io's potential investors, the identities of employees of Fusion-io's potential investors with whom Fusion-io has had contact, the amount of stock that Fusion-io has attempted to sell to potential investors, the monetary and non-monetary terms Fusion-io has offered to potential investors, and other information regarding the nature and duration of Fusion-io's relationships with potential investors;

(f)     Trade secret information regarding Fusion-io's employees and contractors, including the identities and skills of Fusion-io's employees and contractors, the compensation paid to Fusion-io's employees and contractors, and other information regarding the nature and duration of Fusion-io's relationships with employees and contractors;

(g)     Trade secret information regarding Fusion-io's advisory Board relationships;

(h)     Trade secret information regarding the status of Fusion-io's technology, both from a technical standpoint and also regarding Fusion-io's research and development status, including projections regarding the time to market for technologies being developed, information regarding Fusion-io's deployment plans, information regarding the benefits and downsides of the existing technology and Fusion-io's plans for exploiting benefits and addressing downsides in future development of the technology, and information regarding the cost and pricing of its products; and

(i)     Trade secret information regarding Fusion-io's marketing plans, including its plans for traditional and non-traditional advertising, direct communications with customers and potential customers, plans for marketing in connection with the deployment of future products, and plans for obtaining publicity for Fusion-io's products and services.

(j)     Trade secret information regarding Fusion-io's major Original Engine Manufacturers ("OEMs") and actual and potential strategic allies, such as computer

4818-7970-2275.1

hardware manufacturers, hardware wholesalers and retailers, and software companies, including the basis, prospects, and terms for strategic partnerships with such companies and the benefits to be achieved from such partnerships, as well as other information regarding Fusion-io's strategic partnerships.

28.     Basile also remains in possession of Fusion-io's tangible physical property incorporating Fusion-io's proprietary, trade secret information, including but not limited to an ioSAN Prototype Card. "SAN" stands for Storage Array Network, which in general terms is a network of large disk arrays (in this case, any number of Fusion-io SSS devices).  ioSAN is Fusion-io's branded and proprietary SAN card.

29.     The ioSAN Prototype Card in Basile's possession is a next-generation product being developed by Fusion-io, and it is not yet on the market.  Fusion-io produced a limited number of ioSAN Prototype Cards in order to assess and meet the needs of its customers. Fusion-io allows certain customers to evaluate the ioSAN Prototype Cards, but only after those customers enter into a Mutual Nondisclosure Agreement and the Fusion-io Product Evaluation Agreement.  Pursuant to those agreements, customers can use the ioSAN Prototype Cards "solely for internal evaluation and testing purposes," and the customers must agree that they will not attempt to reverse engineer the ioSAN Prototype Cards or allow anyone else to examine or use them.  The ioSAN Prototype Cards incorporate Fusion-io's latest proprietary and trade secret information and would be extremely valuable to a competitor attempting to create a competing product.  In addition, the cost of producing each ioSAN Prototype Card is approximately $10,000.

30.     On numerous occasions since the termination of Basile's employment, Fusion-io and its inside and outside counsel requested that Basile return the company property in his possession or under his control, including but not limited to the ioSAN Prototype Card. Basile never responded to these requests. Between February 13 and approximately March 13, 2009, Fusion-io's counsel had several conversations with Basile and his counsel instructing Basile to return all Fusion-io property and Confidential Information.

31.     On or about March 17, 2009, Fusion-io received an e-mail indicating that Basile might be going to work for a competitor of Fusion-io, Violin Memory. The e-mail was sent by Jeff Newman ("Newman") to the Fusion-io e-mail address of Matt Barletta and to a third party, Steve Lapekas. Barletta was a former employee of Fusion-io and, as a result, all e-mails sent to his Fusion-io e-mail account were automatically forwarded to his former supervisor, Lance Smith, who is Fusion-io's Senior Vice-President of Product Marketing. In Newman's e-mail, he stated that Basile was "becoming the CEO of Violin Memory (still unannounced as yet)." Newman also asked Lapekas to test "the newest Violin Box ASAP." Although Fusion-io was unable to determine whether the matters stated in Newman's e-mail were accurate, it was greatly concerned about the possibility of Basile becoming the CEO of one of its competitors, particularly when Basile was still in possession of Fusion-io's proprietary and trade secret information. Indeed, the e-mail suggested the possibility that "the newest Violin Box" would be tested against the ioSAN Prototype Card or even modified based on the ioSAN Prototype Card.

32.     Thus, on or about March 20, 2009, Fusion-io's outside counsel sent a letter to Basile reminding him of his obligations under his Employment Agreement and PIIA and

requested that Basil return all company property in his possession, including, but not limited to, all electronically stored files on his laptop computer, any electronic storage devices that contain the company's Confidential Information (as defined in the PIIA), the company's ioSAN Prototype Card, and any materials that he received from the company's consultant, Catalyst Operating. Basile never responded to this letter.

33.     On or about March 27, 2009, after receiving no response from Basile, Fusion-io's outside counsel sent a follow-up letter to Basile demanding that he respond to the March 20, 2009, letter and further demanding that Basile submit a written acknowledgment that he has complied – and will continue to comply – with his continuing obligations to the company under the Employment Agreement and PIIA.  Fusion-io's outside counsel demanded that Basile respond no later than the close of business on March 31, 2009, due to increasing concern that Basile was breaching his continuing obligations to the company.

34.     On or about April 1, 2009, Fusion-io and Basile engaged in negotiations in an attempt to resolve this matter without the need for litigation.  At about the same time, Fusion-io learned that Basile had become a managing director of Iron Capital Partners ("Iron Capital"), a venture capital firm that had recently made a substantial investment in Fusion-io.  Because Iron Capital had a vested interest in Fusion-io's success and did not—to Fusion-io's knowledge— compete with or have investments in entities that competed with Fusion-io, Fusion-io was led to believe that Basile would not take actions to Fusion-io's detriment.  Nonetheless, despite the parties' settlement negotiations and the fact Basile apparently was working for a venture capital firm that had just invested in Fusion-io, Basile still failed to return Fusion-io's property and

Confidential Information or even respond to the March 20th or March 27th letters from Fusion-io's outside counsel.

35.     While continuing to engage in settlement negotiations, on or about April 16, 2009, Fusion-io received further information indicating that, while Basile had publicly announced that he was working for Iron Capital, he had secretly accepted employment with Violin – as its Chief Executive Office.  Specifically, on or about April 16, 2009, Newman sent another e-mail to Basile and Barletta.  Once again, because Newman sent the email to Barletta's Fusion-io email address, it was immediately forwarded to Barletta's former supervisor at Fusion-io.  Newman's e-mail included an exchange of e-mails that Newman had with an executive at a different venture capital firm.  In that exchange of e-mails, Newman explained that he was about to become the Chairman of the Board of Directors of Violin Memory and that Basile is the "new CEO."  Newman further informed the potential investor that Violin was "repositioned" as a "Network Attached Solid State System company," which he contrasted with its prior business of being an "old DRAM vendor."  That change makes Violin a direct competitor of Fusion, which markets network attached storage systems using SSS devices that it touts as providing "100 times the capacity density and 10 times the capacity per dollar of DRAM."  It also increases the risk of Basile using Fusion-io's proprietary and trade secret information in an attempt to transform Violin from a DRAM company to a company focusing on enterprise SSS solutions.  Given that Fusion-io has just grown from an 8-employee startup to a 130-employee market leader during Basile's time as CEO, Basile's attempt to "reposition" a new company to compete directly with Fusion-io is little more than an attempt to replicate Fusion-io's business.  That is an alarming

plan given Basile's continued access to Fusion-io's proprietary, trade secret information regarding both the technology used in Fusion-io's business as well as its trade secret business information. For example, Violin's incoming Chairman further clarified that it was moving "into the Network Attached Storage (NAS) and/or Storage Array Network (SAN) world." Of course, that is precisely the kind of business for which Fusion-io's prototype ioSAN card and its other proprietary, trade secret information would be particularly valuable.

36.     After receiving Newman's second email, Fusion-io discovered an article that was posted on the internet by Channel Register that increased Fusion-io's concerns that Basile had become employed by, or was about to become employed by, Violin Memory.  The article discussed "rumors" that Iron Capital might invest in Violin Memory and/or that Basile might accept some position with Violin Memory.

37.     On or about May 6, 2009, Fusion-io sent another letter to Basile demanding that he respond to the March 20th and March 27th letters and further demanding that Basile submit a written acknowledgment that he has complied – and will continue to comply – with his continuing obligations to the company under the Employment Agreement and PIIA. Fusion-io's outside counsel demanded that Basile respond no later than the close of business on May 8, 2009, due to its increasing concern that Basile was breaching his continuing obligations to the company.

38.     To date, Basile has not complied with the demands of Fusion-io's March 20th, March 27th, and May 6th letters, and he has retained all of the Fusion-io property in his

468-7970-2275.1

possession – including Fusion-io's prototype ioSAN card and all of his e-mails and other intellectual property taken from Fusion-io.

## FIRST CLAIM FOR PROVISIONAL INJUNCTIVE RELIEF

39.     Fusion-io repeats and incorporates herein by reference each and every allegation set forth in the paragraphs above, as though fully set forth herein.

40.     Basile was a signatory to the Employment Agreement and PIIA, which are supported by adequate consideration and are in all respects valid, enforceable, and binding contracts. The Employment Agreement and PIIA contained provisions protecting Fusion-io's confidential and proprietary business and trade secret information, by, *inter alia*, (i) requiring Basile to hold the Company's Confidential Information in the strictest of confidence and to prevent its disclosure at all times during his employment and thereafter, and (ii) requiring Basile to return immediately to the company upon his termination "any and all devices, records, data, notes, materials, equipment, other documents or property, or reproductions of any aforementioned items" developed by him pursuant to his employment or otherwise belonging to the Company, its successors or assigns.

41.     Despite the provisions in these agreements, Basile refuses to return Fusion-io's property and therefore threatens disclosure of Fusion-io's confidential and proprietary business and trade secret information to third parties.

42.     By reason of Basile's above-alleged acts and conduct, Fusion-io has already suffered, and will continue to suffer, harm and damage.  This harm will be difficult to ascertain and may be irreparable, leaving Fusion-io without an adequate remedy at law.

43.    Fusion-io is entitled to an injunction ordering Basile to immediately return all property of Fusion-io in his possession, custody or control, and restraining Basile and all persons acting in concert with him, from using, copying, publishing, disclosing, transferring, and/or selling Fusion-io's confidential and proprietary business and trade secret information, and from obtaining any commercial advantage or unjust enrichment from his misappropriation of that information.

44.    Concurrently herewith, Fusion-io is submitting in arbitration a claim against Basile for breach of his agreements, and will seek therein the damages it has suffered, as well as any gains, profits, advantages, and unjust enrichment Basile has obtained as a result of his wrongful acts as alleged above.   In accordance with the arbitration provision in Basile's Employment Agreement, Fusion-io limits its request in this judicial action to a prayer for provisional injunctive relief.

**SECOND CLAIM FOR RELIEF**
**MISAPPROPRIATION OF TRADE SECRETS**

45.    Fusion-io repeats and incorporates herein by reference each and every allegation set forth in the paragraphs above, as though fully set forth herein.

46.    Due to the nature of Fusion-io's business, Fusion-io must protect the secrecy of its many valuable trade secrets and other confidential and proprietary materials in its possession.  In particular, Fusion-io goes to great lengths to protect its electronic information and its computer networks from unauthorized access and/or distribution, including the trade secret materials and confidential communications on its computer networks and shared between its personnel.

47.     When hired, employees are required to sign the PIIA, in which the employee agrees to hold in strictest confidence all of Fusion-io's Confidential Information, which includes all of Fusion-io's confidential and proprietary business and trade secret information. Fusion-io's Confidential Information is only disclosed outside of Fusion-io when necessary, and then only pursuant to strict non-disclosure agreements.

48.     Fusion-io's electronic communications and data are protected from unauthorized third party access (*i.e.*, hacking) by a firewall that prevents unauthorized inbound internet traffic from reaching Fusion-io's computer networks. Fusion-io's employees who have a legitimate need to access Fusion-io's computers, who have signed a PIIA, can access those computers only using a password.

49.     Many of Fusion-io's core trade secrets, including but not limited to computer programming code, schematics, business plans, and e-mails, are located in a secure Data Center. To gain access to the Data Center, an employee must have an electronic key fob, pass a biometric (fingerprint) identification and then once inside, have a password to access Fusion-io's servers. Certain of this information could be accessed by Basile.

50.     Fusion-io's confidential and proprietary business and trade secret information comprise documents and information that are not generally known to the public or to other persons who can obtain economic value from its disclosure or use.

51.     As explained above, Fusion-io's confidential and proprietary business and trade secret information is the subject of reasonable efforts by Fusion-io to maintain their secrecy, and they derive independent economic value from not being generally known.

4818-7970-2275.1

52.     All or a portion of the documents and information comprising Fusion-io's confidential and proprietary business and trade secret information constitute "trade secrets" under the Utah Uniform Trade Secrets Act.

53.     Basile misappropriated Fusion-io's trade secrets through improper means. Specifically, as alleged above, Fusion-io is informed and believes that Basile employed improper means to obtain knowledge of Fusion-io's confidential and proprietary business and trade secret information and subsequently used and/or disclosed this information without the express or implied consent or knowledge of Fusion-io.

54.     As the former CEO of Fusion-io, and because of his acts of misappropriation described above, Basile has access to Fusion-io's most valuable trade secrets. That includes business information as well as technical information and physical property incorporating Fusion-io's trade secret information.

55.     Because of the above-alleged acts and conduct of Basile, Fusion-io has been damaged and, if Basile is not enjoined, Fusion-io will continue to suffer great and irreparable harm. The amount of this irreparable harm will be difficult to ascertain, leaving Fusion-io without an adequate remedy at law. Indeed, disclosure of Fusion-io's product may allow other businesses to gain a competitive advantage that they would not otherwise be entitled to obtain, which will detrimentally affect Fusion-io's place in the market and its market share. Critically, if another company gains access to Fusion-io's proprietary and trade secret information, Fusion-io will lose its status as the only company to use these unique trade secrets. If that happens, the value of the company will decrease significantly.

56. Fusion-io is entitled to a temporary and preliminary injunction restraining Basile and all persons acting in concert with his, from using, copying, publishing, disclosing, transferring, or selling Fusion-io's confidential and proprietary business and trade secret information, or any product or services based on or incorporating all or part of that information, and restraining his from obtaining any commercial advantage or unjust enrichment from the misappropriation of Fusion-io's confidential and proprietary business and trade secret information.

57. Fusion-io is further entitled to an order requiring Basile and all persons acting in concert with his, to return to Fusion-io any and all materials and documents containing Fusion-io's Confidential Information.

58. Fusion-io is further entitled to a temporary and permanent injunction restraining Basile from performing any services for Violin on the grounds that, during the time in which he has wrongfully retained possession of Fusion-io's trade secret information, Basile has accepted employment as Violin's CEO. In using Fusion-io's trade secret information to attempt to "reposition" Violin as an enterprise SSS business, Basile has given that company an unfair advantage that cannot be remedied so long as Basile remains employed by it.

59. Concurrently herewith, Fusion-io is submitting in arbitration a claim against Basile for misappropriation of trade secrets, and will seek therein the gains, profits, advantages, and unjust enrichment Basile has obtained as a result of his wrongful acts as described herein. In accordance with the arbitration provision in Basile's Employment Agreement, Fusion-io limits its request in this judicial action to a prayer for provisional injunctive relief.

## THIRD CLAIM FOR RELIEF
## CONVERSION

60.     Fusion-io alleges again each and every allegation set forth in the paragraphs above, and incorporates them herein by reference.

61.     Fusion-io owns the confidential and proprietary business and trade secret information contained on Basile's laptop computer and in the e-mails diverted from Basile's Fusion-io email account to his personal email account.  Fusion-io also owns the ioSAN prototype card that Basile removed from the company and has refused to return to the company since his termination.  Upon information and belief, Basile wrongfully acquired all or a portion of Fusion-io's confidential and proprietary business and trade secret information.

62.     Fusion-io is entitled to an injunction ordering Basile to immediately return all property of Fusion-io in his possession, custody or control, and restraining Basile and all persons acting in concert with him, from using, copying, publishing, disclosing, transferring, and/or selling Fusion-io's confidential and proprietary business and trade secret information, and from obtaining any commercial advantage or unjust enrichment from his misappropriation of that information.

63.     Concurrently herewith, Fusion-io is submitting in arbitration a claim against Basile for conversion, and will seek therein the damages it has suffered, as well as any gains, profits, advantages, and unjust enrichment Basile has obtained as a result of his wrongful acts as alleged above.  In accordance with the arbitration provision in Basile's Employment Agreement, Fusion-io limits its request in this judicial action to a prayer for provisional injunctive relief.

## FOURTH CLAIM FOR RELIEF
## BREACH OF FIDUCIARY DUTY/DUTY OF LOYALTY

64.     Fusion-io repeats and incorporates herein by reference each and every allegation set forth in the paragraphs above, as though fully set forth herein.

65.     By virtue of his employment with Fusion-io, Basile owed a duty of loyalty to Fusion-io.

66.     Additionally, as a high-ranking executive, Basile owed a fiduciary duty to Fusion-io.

67.     Basile willfully and intentionally breached these duties by diverting Fusion-io's confidential and proprietary business and trade secret information in the e-mails sent to his Fusion-io email account to his personal account for his exclusive use, and by removing Fusion-io property from Fusion-io and not returning it upon termination, all in violation of the PIIA.

68.     As a direct and proximate result of Basile's conduct as alleged hereinabove, Fusion-io has suffered damages.

69.     Fusion-io is entitled to an injunction restraining Basile from further breaches of his fiduciary duties, ordering Basile to immediately return all property of Fusion-io in his possession, custody or control, and restraining Basile and all persons acting in concert with him, from using, copying, publishing, disclosing, transferring, and/or selling Fusion-io's confidential and proprietary business and trade secret information, and from obtaining any commercial advantage or unjust enrichment from his misappropriation of that information.

70.     Concurrently herewith, Fusion-io is submitting in arbitration a claim against Basile for breach of fiduciary duty, and will seek therein the damages it has suffered, as well as any gains, profits, advantages, and unjust enrichment Basile has obtained as a result of his wrongful acts as alleged above.   In accordance with the arbitration provision in Basile's Employment Agreement, Fusion-io limits its request in this judicial action to a prayer for provisional injunctive relief.

**FIFTH CLAIM FOR RELIEF**
**VIOLATION OF COMPUTER FRAUD AND ABUSE ACT**
**18 U.S.C. § 1030(a)(5)(A)**

71.     Fusion realleges each and every allegation set forth in the paragraphs above, and incorporates each allegation herein by reference.

72.     Fusion maintains its trade secrets and confidential and proprietary business information on a computer system that is used in or affecting interstate or foreign commerce or communication, which meets the definition of a "protected computer" contained in 18 U.S.C. § 1030(e)(2)(B).

73.     Fusion provided Basile with an e-mail account on its protected computer system (dbasile@fusionio.com) for Basile to use for business purposes during his employment with Fusion.

74.     Without Fusion's knowledge or authorization, Basile knowingly caused the transmission of a program, information, code, or command that caused all e-mails to his Fusion e-mail account to be diverted to a personal e-mail account created and maintained by Basile (don.basile@stanfordalumni.org).

75.     Basile's transmission of a program, information, code, or command that caused all e-mails to his Fusion e-mail account to be diverted to his personal e-mail account intentionally caused damage without authorization to Fusion's protected computer system. By automatically diverting e-mails sent to Basile's Fusion e-mail account away from Fusion's protected computer system to Basile's personal e-mail account, Basile impaired the integrity or availability of that data or information on Fusion's protected computers in violation of 18 U.S.C. § 1030(a)(5)(A) and caused "damage" within the meaning of 18 U.S.C. § 1030(e)(8).

76.     In order to determine whether it could recover copies of any of the e-mails that Basile diverted to his personal e-mail account, Fusion conducted an examination of its systems and hired a forensic expert to examine Fusion's computer systems to conduct an assessment of the impairment to the integrity or availability of data and information diverted by Basile, and to restore such data or information to the extent possible. As a result of its internal investigation and the services provided by the forensic expert, Fusion has expended in excess of five thousand dollars.     Accordingly, Fusion has suffered a "loss" as that term is used in 18 U.S.C. § 1030(e)(11) in excess of five thousand dollars.

77.     As a direct result of Basile's conduct, Fusion has incurred damages and losses in an amount yet to be determined. Fusion is entitled to recover from Basile all economic damages it has suffered under 18 U.S.C. § 1030(g).

78.     Fusion is unable to ascertain the amount of compensation that could afford Fusion adequate relief for Basile's unlawful acts and, therefore, its remedy at law is inadequate. In addition, Basile's refusal to return to Fusion all data or information that he diverted from his

Fusion e-mail account places Basile in a position to cause further damage (within the meaning of 18 U.S.C. § 1030(e)(8)) by deleting the data or information he has already diverted. Accordingly, Fusion requests an injunction or other equitable relief under 18 U.S.C. § 1030(g) compelling Basile to return to Fusion all data or information that he diverted from his Fusion e-mail account and restraining Basile from engaging in any further acts constituting a violation of 18 U.S.C. § 1030(a)(5)(A), including but not limited to any attempt to delete any data or information that he diverted from his Fusion e-mail account.

79.     Concurrently herewith, Fusion-io is submitting in arbitration a claim against Basile for violation of the Computer Fraud and Abuse Act, and will seek therein the damages it has suffered, as well as any gains, profits, advantages, and unjust enrichment Basile has obtained as a result of his wrongful acts as alleged above.  In accordance with the arbitration provision in Basile's Employment Agreement, Fusion-io limits its request in this judicial action to a prayer for provisional injunctive relief.

**SIXTH CLAIM FOR RELIEF**
**VIOLATION OF COMPUTER FRAUD AND ABUSE ACT**
**18 U.S.C. § 1030(a)(5)(B) and (C)**

80.     Fusion realleges each and every allegation set forth in the paragraphs above, and incorporates each allegation herein by reference.

81.     Fusion maintains its trade secrets and confidential and proprietary business information on a computer system that is used in or affecting interstate or foreign commerce or communication, which meets the definition of a "protected computer" contained in 18 U.S.C. § 1030(e)(2)(B).

82.     Basile intentionally accessed Fusion's protected computers for the purpose of misappropriating Fusion's trade secrets and confidential and proprietary information for the benefit of himself and others, including (but not necessarily limited to) Fusion's competitors and Basile's future employers.

83.     Although Basile was allowed to access Fusion's protected computers for work in the furtherance of Fusion's interests, he was not authorized to use Fusion's protected computers for any other purpose – especially not for the benefit of a competitor seeking to develop competing technology.     Accordingly, Basile's access to accomplish the above-referenced malfeasance was "without authorization" as used in 18 U.S.C. § 1030(a)(5)(B) and (C).

84.     As a result of Basile's intentional access of Fusion's protected computers without authorization, Basile recklessly caused damage impairing the integrity or availability of data or information in violation of 18 U.S.C. § 1030(a)(5)(B).  Such damage includes, but is not limited to, the impairment of the availability of data and information that is located solely on Basile's computer and/or personal e-mail account (to which Fusion has no access), and the impairment of the integrity of data and information that should have been maintained solely on Fusion's protected computers (where Fusion could control access to the data and information).

85.     As a result of Basile's intentional access of Fusion's protected computers without authorization, Basile caused damage impairing the integrity or availability of data or information and loss in violation of 18 U.S.C. § 1030(a)(5)(C).  Such damage includes, but is not limited to, the impairment of the availability of data and information that is located solely on Basile's computer and/or personal e-mail account (to which Fusion has no access), and the impairment of

the integrity of data and information that should have been maintained solely on Fusion's protected computers (where Fusion could control access to the data and information).

86.     In order to determine to what extent its protected computers had been compromised and used impermissibly, Fusion conducted an examination of its systems and hired a forensic expert to examine Fusion's computer systems to conduct an assessment of the damage caused by Basile, and to restore Fusion's data and information to its condition prior to the offense to the extent possible. As a result of its internal investigation and the services provided by the forensic expert, Fusion has expended in excess of five thousand dollars. Accordingly, Fusion has suffered a "loss" as that term is used in 18 U.S.C. § 1030(e)(11) in excess of five thousand dollars.

87.     As a direct result of Basile's conduct, Fusion has incurred damages and losses in an amount yet to be determined. Fusion is entitled to recover from Basile all economic damages it has suffered under 18 U.S.C. § 1030(g).

88.     Fusion is unable to ascertain the amount of compensation that could afford Fusion adequate relief for Basile's unlawful acts and, therefore, its remedy at law is inadequate. In addition, Basile's refusal to return to Fusion all data or information that he accessed without authorization places Basile in a position to cause further damage (within the meaning of 18 U.S.C. § 1030(e)(8)) by deleting the data or information he diverted or copied from Fusion's protected computers. Accordingly, Fusion requests an injunction or other equitable relief under 18 U.S.C. § 1030(g) compelling Basile to return to Fusion all data or information that he diverted or copied from Fusion's protected computers and restraining Basile from engaging in any further

acts constituting a violation of 18 U.S.C. § 1030(a)(5)(B) and (C), including but not limited to any attempt to delete any data or information that he diverted from Fusion's protected computers.

89.     Concurrently herewith, Fusion-io is submitting in arbitration a claim against Basile for violation of the Computer Fraud and Abuse Act, and will seek therein the damages it has suffered, as well as any gains, profits, advantages, and unjust enrichment Basile has obtained as a result of his wrongful acts as alleged above. In accordance with the arbitration provision in Basile's Employment Agreement, Fusion-io limits its request in this judicial action to a prayer for provisional injunctive relief.

**SEVENTH CLAIM FOR RELIEF**
**VIOLATION OF COMPUTER FRAUD AND ABUSE ACT**
**18 U.S.C. § 1030(a)(2)**

90.     Fusion realleges each and every allegation set forth in the paragraphs above, and incorporates each allegation herein by reference.

91.     Fusion maintains its trade secrets and confidential and proprietary business information on a computer system that is used in or affecting interstate or foreign commerce or communication, which meets the definition of a "protected computer" contained in 18 U.S.C. § 1030(e)(2)(B).

92.     Basile intentionally accessed Fusion's protected computers without authorization, or exceeded authorized access, for the purpose of misappropriating Fusion's trade secrets and confidential and proprietary information for the benefit of himself and others, including (but not necessarily limited to) Fusion's competitors and Basile's future employers.

93.     Although Basile was allowed to access Fusion's protected computers for work in the furtherance of Fusion's interests, he was not authorized to use Fusion's protected computers for any other purpose – especially not for the benefit of a competitor seeking to develop competing technology.     Accordingly, Basile's access to accomplish the above-referenced malfeasance was "without authorization" as used in 18 U.S.C. § 1030(a)(2) or, in the alternative, exceeded his authorization, as that term is defined in 18 U.S.C. § 1030(e)(6).

94.     As a result of Basile's intentional access of Fusion's protected computers without authorization or in excess of his authorization, Basile obtained information from Fusion's protected computers in violation of 18 U.S.C. § 1030(a)(2)(C).

95.     In order to determine to what extent its protected computer had been compromised and used impermissibly, Fusion conducted an examination of its systems and hired a forensic expert to image and examine Fusion's computer systems to conduct an assessment of the damage caused by Basile, and to restore Fusion's data and information to its condition prior to the offense to the extent possible.     As a result of its internal investigation and the services provided by the forensic expert, Fusion has expended in excess of five thousand dollars. Accordingly, Fusion has suffered a "loss" as that term is used in 18 U.S.C. § 1030(e)(11) in excess of five thousand dollars.

96.     As a direct result of Basile's conduct, Fusion has incurred damages and losses in an amount yet to be determined.     Fusion is entitled to recover from Basile all economic damages it has suffered under 18 U.S.C. § 1030(g).

97.     Fusion is unable to ascertain the amount of compensation that could afford Fusion adequate relief for Basile's unlawful acts and, therefore, its remedy at law is inadequate.  In addition, Basile's refusal to return to Fusion all information that he accessed without authorization, or in excess of his authorization, places Basile in a position to cause further damage (within the meaning of 18 U.S.C. § 1030(e)(8)) by deleting information he diverted or copied from Fusion's protected computers.  Accordingly, Fusion requests an injunction or other equitable relief under 18 U.S.C. § 1030(g) compelling Basile to return to Fusion all information that he diverted or copied from Fusion's protected computers and restraining Basile from engaging in any further acts constituting a violation of 18 U.S.C. § 1030(a)(2), including but not limited to any attempt to delete any information that he diverted from Fusion's protected computers.

98.     Concurrently herewith, Fusion-io is submitting in arbitration a claim against Basile for violation of the Computer Fraud and Abuse Act, and will seek therein the damages it has suffered, as well as any gains, profits, advantages, and unjust enrichment Basile has obtained as a result of his wrongful acts as alleged above.  In accordance with the arbitration provision in Basile's Employment Agreement, Fusion-io limits its request in this judicial action to a prayer for provisional injunctive relief.

## **PRAYER FOR RELIEF**

Fusion-io prays for judgment against Basile as follows:

1.     For a writ of possession, a temporary restraining order, and preliminary injunctive relief, requiring defendant Donald G. Basile, and all those acting in concert with him, to

4818-7970-2275.1

immediately return to Fusion-io any and all Fusion-io confidential and proprietary business and trade secret information in his possession, custody or control or that subsequently comes into his possession, custody or control, including the Fusion-io confidential and proprietary business and trade secret information described above, and to account for each and every disclosure, transfer, and/or other use of any part of the this information, including an accounting of each any every individual given access to any part of this information and the timing, extent and nature of that access;

      2.     For temporary and preliminary injunctive relief, enjoining and restraining Donald G. Basile from the wrongful acts and conducts set forth above, including an order that he, and all other persons acting in active concert or privity or in participation with him, be enjoined:

          (a) from further disclosing or otherwise using Fusion-io's confidential and proprietary business and trade secret information, whether in electronic, hard-copy, or other form, wrongfully obtained or retained from Fusion-io, including Fusion-io's confidential and proprietary business and trade secret information described above, (1) by citing, quoting, making notes from, or otherwise using this information in the creation of any material, whether written, recorded or otherwise; (2) making any copies of such information, whether electronically or by other means; (3) communicating such information to any person or third party; (4) transferring such information to any other storage media, computer, server, facility, or other tangible or

intangible thing where such information might be stored; and (5) or any other means; and

(b) from transferring Fusion-io's confidential and proprietary business and trade secret information, whether in electronic, hard-copy, or other form, wrongfully obtained from Fusion-io, including the Fusion-io's confidential and proprietary business and trade secret information; and

(c) from contacting any current or former employee of Fusion-io or from taking any other steps for the purpose of wrongfully obtaining Fusion-io's confidential and proprietary business and trade secret information, including Fusion-io's confidential and proprietary business and trade secret information described above; and

(d) from violating any of Basile's continuing duties to Fusion-io under his Employment Agreement and PIIA, including but not limited to his obligations not to solicit Fusion-io employees to terminate their employment with Fusion-io and not to disparage Fusion-io; and

(e) from deleting or destroying any Fusion-io property or Confidential information before returning it to Fusion-io;

3.      For temporary and preliminary injunctive relief, enjoining and restraining Donald G. Basile from serving as Violin's CEO or performing any services for Violin for a period of twelve months;

4.      For attorneys' fees and costs of suit herein incurred; and

5. For such other, further, and/or different relief as the Court may deem just and proper.

DATED this 8th day of May, 2009.

PARSONS BEHLE & LATIMER

By _____
DAVID M. BENNION
SCOTT S. BELL
Attorneys for Plaintiff Fusion
Multisystems, Inc. d/b/a Fusion-io

Plaintiff's Address:

6350 South 3000 East 6th Floor
Salt Lake City, UT 84121

# EXHIBIT

# A

## AMENDED AND RESTATED
## EMPLOYMENT AGREEMENT

**THIS AMENDED AND RESTATED EMPLOYMENT AGREEMENT** (this "**Agreement**") is made and entered into as of December 31, 2008 (the "**Effective Date**"), by and among Fusion Multisystems, Inc., a Nevada corporation (the "**Company**") and Don Basile, an individual ("**Executive**").

### RECITALS:

A. The Company desires that Executive be employed by the Company to carry out the duties and responsibilities described below, all on the terms and conditions hereinafter set forth.

B. Executive desires to accept such employment on such terms and conditions.

C. The parties entered into an Employment Agreement dated as of March 21, 2008 (the "**Employment Agreement**").

D. The parties now wish to amend and restate the Employment Agreement to include terms and conditions designed to make any payments pursuant to the Employment Agreement compliant with Section 409A of the Internal Revenue Code of 1986 (including the Treasury Regulations and other published guidance related thereto) ("**Section 409A**").

E. This Agreement shall govern the employment relationship between Executive and the Company from and after the Effective Date, and supersedes and negates all previous negotiations and agreements with respect to such relationship.

**NOW, THEREFORE**, in consideration of the above recitals incorporated herein and the mutual covenants and promises contained herein and other valuable consideration, the receipt and sufficiency of which is hereby expressly acknowledged, the parties agree as follows:

**1.     EMPLOYMENT**. Subject to the terms set forth herein, the Company hereby agrees to continue to employ Executive as its Chief Executive Officer. Executive shall report directly to the Company's Board of Directors (the "**Board**"), and shall perform such officer level duties and have such officer level authority and responsibility as is usual and customary for such position, plus any additional officer level duties as may reasonably be assigned from time to time by the Board, including but not limited to providing services to one or more of the Company's subsidiaries or affiliates (the compensation for such services shall be covered exclusively by Sections 3 through 8 of this Agreement). Executive hereby accepts such employment and agrees to devote substantially all of Executive's business time, energy and skill to the performance of Executive's duties for the Company. Executive shall be subject to the Company's policies, procedures and approval practices, as generally in effect from time-to-time.

2.    **EMPLOYMENT TERM**. Executive's employment hereunder is "at-will" and either Executive or the Company may terminate such employment at any time, for any or no reason, subject to the provisions of Section 8.

3.    **COMPENSATION**.

a.    Base Salary.  The Company agrees to pay Executive an initial salary of , less required deductions and withholdings (the "**Salary**"). The Board will review Executive's Salary annually to determine whether Executive should receive an adjustment in Salary, provided that Executive's Salary shall not be reduced without Executive's prior written consent. The Salary shall be paid in installments accordance with the Company's usual payroll practices.

b.    Annual Bonus.  During the period of employment, Executive shall be entitled to earn an annual performance-based bonus ("**Annual Bonus**") as follows:

(i)    Commencing in fiscal year 2008 and thereafter during Executive's employment by the Company, Executive will be eligible to receive an Annual Bonus of                                 ent Salary, based on Executive's achievement of performance objectives as established in good faith by the Board (or any Compensation Committee of the Board) in writing as soon as reasonably practicable, but no later than the last day of the first quarter of the applicable fiscal year. To earn any such Annual Bonus, Executive must be continuously employed by the Company through the end of the applicable fiscal year.

(ii)    Each Annual Bonus earned by Executive, if any, will be due and payable on the first regular payroll date following the 60th day after the end of the applicable fiscal year (the "**Annual Bonus Payment Date**"). For the avoidance of doubt, if Executive's employment terminates after the end of an applicable fiscal year but prior to the Annual Bonus Payment Date, Executive will be paid any earned Annual Bonus on the Annual Bonus Payment Date. Any Annual Bonus paid to Executive shall be subject to applicable deductions and withholdings.

4.    **STOCK VESTING; EQUITY GRANTS**.

(i)     Executive shall acquire a vested interest in the Shares in a series of forty-eight (48) successive equal monthly installments for each monthly period of continuous Service measured from February 1, 2008;

(ii)     If Executive's employment by the Company is terminated by the Company pursuant to Section 8(d)(ii) or by Executive pursuant to Section 8(e), in either case at such time that Section 4(a)(iii) below does not apply, and Executive has executed (and not revoked) a general release of claims acceptable to the Company, then Executive shall immediately acquire a vested interest in the lesser of (1) all Shares in which Executive has not acquired a vested interest in accordance with the vesting provisions of the option agreement (such shares are referred to as "**Unvested Shares**") and (2) that number of Unvested Shares that Executive would have vested in had Executive continued in Service for an additional twelve months;

(iii)     If there occurs a Change in Control, as defined in Section 4(a)(v) below, while Executive is employed by the Company, and if Executive's employment by the Company is terminated by the Company or by any successor thereto pursuant to Section 8(d)(ii) or by Executive pursuant to Section 8(e) on or following such Change in Control, then Executive shall immediately acquire a vested interest in all Unvested Shares; and

(iv)     if Executive dies or suffers a Disability (which results in the termination of Executive's employment pursuant to Section 8(b)), then Executive shall immediately acquire a vested interest in all remaining Unvested Shares.

(v)     "**Change in Control**" means: any acquisition of the Company by means of merger or other form of corporate reorganization in which outstanding shares of the Company are exchanged for securities or other consideration issued, or caused to be issued, by the acquiring corporation or its subsidiary and in which the holders of capital stock of the Company immediately prior to the acquisition hold less than 50% of the voting power of the surviving entity or its parent, (ii) a sale of all or substantially all of the assets of the Company, (iii) the closing of the transfer (whether by merger, consolidation or otherwise), in one transaction or a series of related transactions, to a person or group of affiliated persons, of the Company's then outstanding securities if, after such closing, such person or group of affiliated persons would hold 50% or more of the outstanding voting stock of the Company (other than an equity financing effected primarily for capital raising purposes).

(vi)     For purposes of this Agreement, Executive shall be deemed to remain in "Service" for so long as Executive continues to actually and physically render services to the Company or any parent or subsidiary corporation, whether as an employee, a non-employee member of the Board of Directors or an independent contractor or consultant, solely as determined by and in accordance with the directives of the Board of Directors of the Company. By executing this Agreement, Executive agrees to abide by such Board determination.

(b)     Executive shall also be eligible to participate in and receive additional equity grants commensurate with his position and level in any stock option plan, restricted stock plan or other equity-based or equity related compensation plan, programs or agreements of the Company made available generally to its senior executives.  Executive

acknowledges and agrees, however, that, other than as set forth in clauses (i) and (ii) below, any such grants shall be at the sole discretion of the Board (or any applicable committee of the Board) and the Company is under no obligation to make any further equity grants to Executive.

      (i)     After the closing of the Company's Series A financing, including any subsequent closings thereof, and upon the closing of the Company's next round of equity financing pursuant to which the Company has issued and sold shares of its next round of preferred stock with gross proceeds to the Company of at least $10,000,000 (the "**Series B Financing**"), if Executive is continuing in Service at the closing of such Series B Financing, the Board shall authorize, and

~~option (the "Series B Option Shares"), the option agreement govern~~

Executive shall acquire a vested interest in the Series B Option Shares, in a series of forty-eight successive equal monthly installments for each monthly period of continuous Service measured from the date of grant of the Series B Option.

      (ii)    With respect to the all future option grants to Executive, including the Series B Option, the option agreements covering such grants shall provide for accelerated vesting commensurate with the provisions in sub-sections 4(a)(ii), (iii) and (iv).

(c)    Executive shall not transfer any Unvested Shares (except to the Company or its assignee) without the prior written consent of the Company, which consent may be granted, conditioned or withheld in the Company's sole discretion.

5.    **BENEFITS**.  Executive will be entitled to participate in the employee benefit plans, including but not limited to any bonus plan, incentive, participation or extra compensation plan, pension plan, profit-sharing plan, life, medical, dental, disability, or insurance plan or policy or other plan currently and hereafter maintained by the Company of general applicability to other senior executives of the Company; provided, however, that Executive's right to receive equity or participate in equity plans shall be governed exclusively by Section 4 of this Agreement, and Executive's right to receive severance upon a termination of employment for any reason shall be governed exclusively by Section 8 of this Agreement. If Executive's employment by the Company is terminated by the Company pursuant to Section 8(d)(ii) or by Executive pursuant to Section 8(e), following Executive's Separation from Service (as defined below), the Company will pay the premiums to continue Executive's and any of Executive's eligible dependents' health insurance coverage under COBRA (provided that Executive is eligible and timely elects

4

COBRA coverage) until the earlier of twelve (12) months after Executive's Separation from Service and the first date that Executive and Executive's eligible dependents are covered under another employer's program, provided that the Company is providing Executive with health insurance coverage at the time of Executive's termination.

6.     **VACATION**. Executive will be entitled to accrue vacation time, in an amount and subject to the accrual limits determined by the Board annually in its sole discretion; provided that Executive shall be entitled to accrue not less than four (4) weeks of paid vacation each twelve-month period, and shall be subject to any maximum vacation accrual policy implemented by the Company that is applicable to all executive officers. Such vacation shall be scheduled and taken at the mutual convenience of the Executive and the Company.

7.     **EXPENSES**. Executive shall be entitled to receive reimbursement for all reasonable and customary documented travel and business expenses incurred in connection with Executive's employment, so long as such expenses are incurred and accounted for in accordance with the policies and procedures as may be established from time to time by the Company.

8.     **TERMINATION**. Notwithstanding anything in this Agreement to the contrary, in the event of a termination of Executive's employment by the Company, the following provisions shall apply:

     (a)     Death. Upon the death of Executive, Executive's employment with the Company shall terminate and the Company shall not be obligated to make any further payments to Executive hereunder, except amounts due as Salary or accrued but unused vacation earned at the time of Executive's termination of employment, and reimbursement for any expenses incurred prior to Executive's termination of employment in accordance with Section 7 hereof (collectively "**Accrued Obligations**"), as well as a pro rata portion of Executive's Annual Bonus that would otherwise have been payable for the year in which Executive died based on a percentage of the number of days Executive worked for the Company during the applicable calendar year. Payment of the portion of Executive's Annual Bonus shall be made at the time made to other participants in the Annual Bonus plan, but in no event later than the Annual Bonus Payment Date.

     (b)     Disability. In the event that the Board reasonably determines in good faith that Executive is unable, because of illness, incapacity or injury which is determined to be total and permanent by a physician selected by the Company or its insurers and acceptable to Executive or Executive's legal representative (such agreement as to acceptability not to be withheld unreasonably), to perform the essential functions of his employment with the Company, even with reasonable accommodation that does not impose an undue hardship on the Company, for more than twelve (12) weeks in any rolling one-year period ("**Disability**"), unless a longer period is required by federal or state law, in which case that longer period shall apply, the Board shall have the right to terminate Executive's employment, and the Company shall not be obligated to make any further payments to Executive hereunder, except payment of Accrued Obligations and a pro rata portion of Executive's Annual Bonus that would otherwise have been payable for the year in which Executive is terminated due to Disability based on a percentage of the number of days Executive worked for the Company during the applicable calendar year.

The Board reserves the right, in good faith, to make a reasonable determination of Disability under this Agreement based on information supplied by the physician selected as provided herein. Payment of the portion of Executive's Annual Bonus due under this Section 8(b) shall be made at the time made to other participants in the Annual Bonus plan, but in no event later than the Annual Bonus Payment Date. Executive expressly agrees that the Company shall have the right to permanently replace Executive in the event he is terminated due to a Disability.

(c)     Termination for Cause. The Board may terminate Executive's employment at any time immediately upon notice to Executive for "Cause."

(i)     For purposes of this Agreement, "**Cause**" shall mean any of the following occurring during Executive's employment by the Company (except with respect to clause (e) below): (a) personal dishonesty by Executive involving Company business, or breach of Executive's fiduciary duty to Company; (b) indictment or conviction of a felony or other crime involving moral turpitude or dishonesty; (c) Executive's willful refusal to comply with the lawful requests made of Executive by the Board reasonably related to his employment by the Company and the performance of his duties with respect thereto (but which shall not include a request to waive or amend any portion of this Agreement or terminate this Agreement or to consent to an action that would result in Executive's loss of a right under this Agreement); (d) material violation of the Company's policies, after written notice to Executive and an opportunity to be heard by the Board and his failure to fully cure such violations within a reasonable period of time of not less than thirty (30) days after such hearing; and (e) a material breach by Executive of any material provision of this Agreement after written notice to Executive and an opportunity to be heard by the Board and his failure to fully cure such breach within a reasonable period of time of not less than thirty (30) days after such hearing.

(ii)     In the event that the Board terminates Executive's employment for Cause, the Company shall not be obligated to make any further payments to Executive hereunder, except payment of Accrued Obligations.

(d)     Termination Without Cause.

(i)     By Executive. Notwithstanding any other provision of this Agreement, Executive may voluntarily resign from his employment with the Company at any time, and for any reason or no reason, with or without cause. Upon the effective date of such resignation (other than a resignation for Good Reason), the Company shall not be obligated to make any further payments to Executive hereunder, except Accrued Obligations.

(ii)     By Company. Notwithstanding any other provision in this Agreement, the Board (at its sole discretion) shall have the right to terminate Executive's employment at any time, for any reason or no reason, immediately upon notice to Executive. If the Board terminates Executive's employment pursuant to this

Section 8(d)(ii), the Company shall pay to Executive Accrued Obligations. In addition, if the Board terminates Executive's employment pursuant to this Section 8(d)(ii) or if Executive resigns pursuant to Section 8(e), subject to Executive promptly executing (and not revoking) a general release of all claims arising out of his employment in a form that is acceptable to the Company within 21 days of Executive's termination (or such other longer period as may be required by applicable law), the Company shall pay the Executive one times his Salary at the annualized rate in effect on the date of his termination (the "**Severance Payment**"). The Company shall pay the Severance Payment in substantially equal installments in accordance with the Company's standard payroll practices over a period of twelve consecutive months, with the first installment payable in the month following the month in which Executive's Separation from Service (as defined below) occurs. (For purposes of clarity, each such installment shall equal the applicable fraction of the aggregate Severance Payment. For example, if such installments were to be made on a monthly basis, each installment would equal one-twelfth ($1/12^{th}$) of the Severance Payment.) Executive's right to receive and retain any of the Severance Payment (as a result of a termination by either the Company without Cause or by Executive for Good Reason) is contingent upon Executive's compliance with Executive's continuing obligations to the Company under the terms of this Agreement and the Proprietary Information and Invention Assignment Agreement (as defined below). In the event of termination by the Company without Cause pursuant to this Section 8(d)(ii), Executive shall have no duty to mitigate damages.

(e)     Executive Resignation for Good Reason. Executive may also resign from his employment for Good Reason (as defined below). In such event, the Company shall pay Executive the same Severance Payment specified in Section 8(d)(ii) herein in connection with a termination without Cause by the Company. In the event of termination by the Executive for Good Reason pursuant to this Section 8(e), Executive shall have no duty to mitigate damages.

Resigning with "**Good Reason**" means Executive's resignation from employment with the Company within 90 days after any of the following without Executive's prior written consent: (i) the Company's failure to pay Executive any earned Salary or Annual Bonus or other bonus or payment that has become due and payable, provided that the Company receives written notice from Executive of the deficient payment and has been given 30 days to cure; or (ii) prior to a Change in Control, removal of Executive as Chief Executive Officer or a material reduction in his responsibilities, authority or status as such; or (iii) following a Change in Control, removal of Executive as Chief Executive Officer of the Company or as president or general manager of a division or principal business unit of the acquiring company or a material reduction in his responsibilities, authority or status as such; or (iv) a reduction in Executive's Salary by more than 10% except in connection with a Company cost-reduction program applied to all executive officers; or (v) a relocation of the Company's principal executive offices by more than fifty (50) miles from the current location in Salt Lake City, Utah; or (vi) any material breach by the Company of a material provision of this Agreement, which the Board fails to cure within thirty (30) days of receiving written notice from Executive.

NY1:1763809.3

9.    **SECTION 409A.**

(a)    For purposes of this Agreement, a "Separation from Service" occurs when Executive dies, retires or otherwise has a termination of employment with the Company that constitutes a "separation from service" within the meaning of Treasury Regulation Section 1.409A-1(h)(1), without regard to the optional alternative definitions available thereunder.

(b)    If Executive is a "specified employee" within the meaning of Treasury Regulation Section 1.409A-1(i) as of the date of Executive's Separation from Service, Executive shall not be entitled to any payment or benefit pursuant to clause (ii) of Section 8(d)(2) or Section 8(e) until the earlier of (i) the date which is six (6) months after his Separation from Service for any reason other than death, or (ii) the date of Executive's death. The provisions of this paragraph shall only apply if, and to the extent, required to avoid the imputation of any tax, penalty or interest pursuant to Section 409A. Any amounts otherwise payable to Executive upon or in the six (6) month period following Executive's Separation from Service that are not so paid by reason of this Section 9(b) shall be paid (without interest) as soon as practicable (and in all events within thirty (30) days) after the date that is six (6) months after Executive's Separation from Service (or, if earlier, as soon as practicable, and in all events within thirty (30) days, after the date of Executive's death).

(c)    To the extent that any reimbursement pursuant to this Agreement is taxable to Executive, Executive shall provide the Company with documentation of the related expenses promptly so as to facilitate the timing of the reimbursement payment contemplated by this paragraph, and any reimbursement payment due to Executive pursuant to such provision shall be paid to Executive on or before the last day of Executive's taxable year following the taxable year in which the related expense was incurred. Such reimbursement obligations pursuant to this Agreement are not subject to liquidation or exchange for another benefit and the amount of such benefits that Executive receives in one taxable year shall not affect the amount of such benefits that Executive receives in any other taxable year.

(d)    It is intended that any amounts payable under this Agreement and the Company's and Executives exercise of authority or discretion hereunder shall comply with and avoid the imputation of any tax, penalty or interest under Section 409A. This Agreement shall be construed and interpreted consistent with that intent.

10.    **NONSOLICITATION/NONDISPARAGEMENT**. In the event of the termination of Executive's employment for any reason, Executive shall not, for a period of twelve (12) months, directly or indirectly:

(a)    solicit, induce or encourage any employee of the Company or any of its affiliates or subsidiaries to terminate their employment with the Company or any of its affiliates or subsidiaries;

(b)     make any derogatory public statement concerning the financial performance, products, services, the Board or management personnel of the Company or any of its affiliates or subsidiaries, or Executive's employment; or

(c)     use or disclose the Company's Confidential Information to induce, attempt to induce or knowingly encourage any Customer of the Company or any of its affiliates or subsidiaries to divert any business or income from the Company or any of its affiliates or subsidiaries, or to stop or alter the manner in which they are then doing business with the Company or any of its affiliates or subsidiaries.

The term **"Customer"** shall mean any individual or business firm that is, or within the prior twelve (12) months was, a customer or client of the Company, whether or not such business was actively solicited by Executive on behalf of the Company or any of its affiliates or subsidiaries during Executive's employment. Nothing in Section 10(b) shall prohibit Executive from providing truthful testimony in any legal, administrative or regulatory proceeding and Executive may at all times respond truthfully to a lawfully-issued subpoena, court order or governmental inquiry or as otherwise may be required by law, provided, however, that upon receiving such lawfully-issued subpoena or court order, Executive shall promptly provide reasonable written notice to Company and cooperate with the Company to the extent reasonably necessary to protect the confidentiality of any proprietary or trade secret information of the Company or any of its affiliates or subsidiaries, and the privacy rights of any employee or director.

**11.     NONCOMPETITION.** During the term of this Agreement, Executive shall not accept or engage, directly or indirectly, any work, consulting, or other services, for remuneration of any kind for any other business entity engaged in the Covered Business, without written approval by the Board. Nothing in this Agreement will prevent Executive from: (i) accepting speaking or presentation engagements in exchange for honoraria; (ii) serving on advisory boards that do not compete with the Covered Business of the Company (or any of its subsidiaries or affiliates) or boards of trade associations or boards of charitable organizations so long as such service does not unduly interfere with the performance of Executive's duties to the Company and provided that Executive provides prior written notice to the Board; or (iii) from making or owning, directly or indirectly, any passive investment in any other business or entity that does not compete with the Covered Business of the Company. For purposes of this Agreement, the phrase **"Covered Business"** shall mean the business conducted or demonstrably anticipated to be conducted as of the date of any such action by the Company (and its subsidiaries and affiliates). The phrase "engage, directly or indirectly" means engaging or having an interest in, directly or indirectly, as owner, partner, participant of a joint venture, trustee, proprietor, shareholder, member, manager, director, officer, employee, independent contractor, capital investor, lender, consultant, advisor or similar capacity, or by lending or allowing his name or reputation to be used in connection with, or otherwise participating in or allowing his skill, knowledge or experience to be used in connection with, the operation, management or control of a business or enterprise engaged in any aspect of the Covered Business, or being connected with or having any financial interest in any business or enterprise engaged in the Covered Business, except for the purposes of performing services on behalf of the Company or any of its subsidiaries or affiliates pursuant to this Agreement.

12.   **PROPRIETARY INFORMATION AND INVENTION ASSIGNMENT AGREEMENT**.  During the term of this Agreement and at all relevant times thereafter, and as a condition to the receipt of any severance benefits hereunder, Executive agrees to abide and be bound by the terms of a proprietary information and invention assignment agreement entered into by the Company and Executive (the "**Proprietary Information and Invention Assignment Agreement**").

13.   **INJUNCTIVE RELIEF**.  Executive agrees that it would be difficult or impossible to measure the damage to the Company from any breach by Executive of the covenants set forth in Sections 10, 11 or 12 of this Agreement; that damages to the Company for any such injury would therefore be an inadequate remedy for any such breach, and that such breach would cause irreparable harm to the Company.  Executive agrees that in the event of a breach of the terms of any such Section, upon satisfaction of the applicable legal requirements and prerequisites, the Company shall be entitled, in addition to and without limitation upon all other remedies the Company may have, to injunctive or other appropriate equitable relief to restrain any such breach.

14.   **NOTICES**.  All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by facsimile or by registered or certified mail (postage prepaid, return receipt requested) to each other party as follows:

| | |
|---|---|
| if to the Company to: | Fusion Multisystems, Inc.<br>1011 E. Murray Holladay Road<br>Salt Lake City, Utah 84117<br>Telecopier: (801) 293-3054 |
| with copies to: | O'Melveny & Myers LLP<br>2765 Sand Hill Road<br>Menlo Park, California 94025<br>Telecopier: (650) 473-2601<br>Attention: Warren T. Lazarow, Esq. |
| if to the Executive to: | Don Basile<br><br>_____<br>_____ |

or to such other address as the person to whom notice is given may have previously furnished to the other in writing in the manner set forth above.

15.   **WAIVER OF BREACH**.  The waiver of any breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.  Each and every right, remedy and power hereby granted to any party or allowed it by law shall be cumulative and not exclusive of any other.

16.   **SEVERABILITY**.  If any of the provisions of this Agreement or the application thereof to any party under any circumstances is adjudicated to be invalid or unenforceable, such

invalidity or unenforceability shall not affect any other provision of this Agreement or the application thereof.

17.     **ENTIRE AGREEMENT**. This Agreement, along with any related documents and agreement (including the Proprietary Information and Invention Assignment Agreement) and referenced herein, constitutes the entire Agreement between the parties with respect to the subject matter hereof and supersedes and completely and irrevocably terminates any and all other previous or contemporaneous communications, representations, understandings, agreements, negotiations and discussions, either oral or written, between the parties with respect to the subject matter hereof. Without limiting the generality of the foregoing, the parties expressly agree that this Agreement supersedes the terms of (i) any offer letter that may have been in existence between the parties and (ii) the Employment Agreement. The parties acknowledge and agree that there are no written or oral agreements, understandings, or representations, directly or indirectly related to this Agreement or the employment, compensation or benefits of Executive that are not set forth herein. Notwithstanding anything herein to the contrary, nothing in this Agreement shall in any way supersede, limit or affect any representation, warranty, covenant or term of the Proprietary Information and Invention Assignment Agreement; provided that in the event of a conflict between this Agreement and the Proprietary Information and Invention Assignment Agreement, this Agreement shall govern. Except as set forth in Section 4 hereof, nothing herein shall affect in any way the agreements entered into by Executive with the Company or any other person(s) with respect to his ownership of the Shares or any other securities of the Company.

18.     **AMENDMENT OF AGREEMENT**. This Agreement may be altered or amended in any of its provisions only by the mutual written agreement of the parties hereto. This Agreement may not be amended orally in any respect.

19.     **SUCCESSORS**. The Agreement shall inure to the benefit of and be binding on the Company and its successors and assigns, as well as Executive and his estate and its successors and permitted assigns. Executive may not assign or delegate, in whole or in part, his duties or obligations under this Agreement. This Agreement may be transferred and assigned by the Company to any successor of the Company by acquisition, merger, reorganization, amalgamation, asset sale or otherwise. Upon any assignment of this Agreement by the Company, all obligations of the Company shall terminate, Executive shall become employed by the assignee in accordance with the terms of this Agreement and the term "Company" as used in this Agreement shall include only such assignee.

20.     **RIGHTS CUMULATIVE**. The Company's rights under this Agreement are cumulative, and the exercise of one right will not be deemed to preclude the exercise of any other rights.

21.     **COUNTERPARTS**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Photographic copies of such signed counterparts may be used in lieu of the originals for any purpose.

22.    **CONSTRUCTION**.  Each party has cooperated in the drafting and preparation of this Agreement, and therefore, the Agreement shall not be construed against either party on the basis that any particular party was the drafter.

23.    **VOLUNTARY COUNSEL**.  Executive agrees and acknowledges that he has read and understood this Agreement prior to signing it, has entered into this Agreement freely and voluntarily, has been advised to seek legal counsel prior to entering into this Agreement and has had ample opportunity to do so.

24.    **GOVERNING LAW**.  This Agreement shall be construed in accordance with, and governed in all respects by, the internal laws of the State of Utah (without giving effect to principles of conflicts of laws).

25.    **ARBITRATION**

(a)    In exchange for the benefits of the speedy, economical and impartial dispute resolution procedure of arbitration, the Company and Executive, with the advice and consent of their selected counsel, choose to forego their right to resolution of their disputes in a court of law by a judge or jury, and instead elect to treat their disputes, if any, pursuant to the Federal Arbitration Act and/or Utah Arbitration Act.

(b)    Executive and the Company agree that any and all claims or controversies whatsoever brought by Executive or the Company, arising out of or relating to this Agreement, Executive's employment with Company, or otherwise arising between Executive and Company, will be settled by final and binding arbitration in Salt Lake City, Utah or such other location as may be mutually agreed by parties in accordance with the Employment Arbitration Rules and Procedures of Judicial Arbitration and Mediation Services, Inc. ("JAMS") then in effect.  This includes all claims whether arising in tort or contract and whether arising under statute or common law.  Such claims may include, but are not limited to, those relating to this Agreement, wrongful termination, retaliation, harassment, or any statutory claims under Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Fair Employment and Housing Act, the Age Discrimination in Employment Act, the Americans with Disabilities Act, or similar Federal or state statutes.  In addition, any claims arising out of the public policy of Utah, any claims of wrongful termination, employment discrimination, retaliation, or harassment of any kind, as well as any claim related to the termination or non-renewal of Executive's employment or this Agreement shall be arbitrated under the terms of this Agreement. The obligation to arbitrate such claims will survive the termination of Executive's employment or this Agreement.  To the extent permitted by law, the hearing and all filings and other proceedings shall be treated in a private and confidential manner by the arbitrator and all parties and representatives, and shall not be disclosed except as necessary for any related judicial proceedings.

(c)    The arbitration will be conducted before an arbitrator to be mutually agreed upon by the parties from JAMS' panel of arbitrators.  In the event that the parties are unable to mutually agree upon the arbitrator, JAMS shall provide a slate of five arbitrators with experience in employment law and each party shall have the opportunity to strike two

names and rank the remaining arbitrators in order of preference. JAMS shall then select the highest ranked arbitrator to preside over the arbitration. If JAMS is unable to provide an arbitrator who has experience in employment law, the parties may jointly or separately petition the court for appointment of an arbitrator with such experience. The arbitrator will have jurisdiction to determine the arbitrability of any claim. The arbitrator shall have the authority to grant all monetary or equitable relief (including, without limitation, injunctive relief, ancillary costs and fees, and punitive damages) available under state and Federal law. Either party shall have the right to appeal any adverse rulings or judgments to the JAMS Panel of Retired Appellate Court Justices or as otherwise required by Utah law for enforcement of arbitration provisions covering the subject matter of the parties' dispute. Judgment on any award rendered by the arbitrator may be entered and enforced by any court having jurisdiction thereof. In addition to any other relief awarded, the prevailing party in any arbitration or court action covered by this Agreement, as determined by the arbitrator or court in a final judgment or decree, shall be entitled to recover costs, expenses, and reasonable attorneys' fees to the extent permitted by law.

(d)     Notwithstanding the foregoing, the parties agree to participate in non-binding mediation in Salt Lake City, Utah, except that either party may file any formal arbitration demand as necessary to preserve their legal rights as well as any action for provisional injunctive relief in any court of competent jurisdiction to prevent immediate and irreparable harm and to ensure that the relief sought by the aggrieved party is not rendered ineffectual pending the arbitration. The Company shall pay the fees of the mediator and any related administrative fees or costs charged in connection with any mediation held pursuant to this Section.

*[Remainder of Page Intentionally Left Blank]*

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the date and year first above written.

**"Company"**

**FUSION MULTISYSTEMS, INC.,**
**a Nevada corporation**

By: _____
    David Flynn
    Chief Technology Officer

**"Executive"**

**DON BASILE**

_____

# EXHIBIT
# B

EMPLOYEE PROPRIETARY INFORMATION AND
INVENTION ASSIGNMENT AGREEMENT
(CALIFORNIA)

As a condition of my employment with Fusion Multisystems, Inc. (dba Fusion-io), its subsidiaries, affiliates, successors or assigns (together the "Company"), and in consideration of my employment or continued employment with the Company and my receipt of the compensation now and hereafter paid to me by the Company, I agree to the following:

**1.     EMPLOYMENT.** I understand and acknowledge that the terms of my employment with the Company are governed by the Employment Agreement between the Company and me (the "Employment Agreement"). If there is a conflict between this agreement and the Employment Agreement, the terms of the Employment Agreement shall control.

**2.     CONFIDENTIAL INFORMATION.**

**(a)     Company and Third Party Information.** I agree that at all times during the term of my employment and thereafter, to hold in strictest of confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation without written authorization of the Board of Directors of the Company, any Confidential Information of the Company. I understand that "Confidential Information" means any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, information relating to products, services, software, research, developments, technology, hardware configuration information, marketing, finances or other business information disclosed to me by the Company either directly or indirectly in writing, orally or by drawings or observation of parts or equipment. I recognize that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes, and I understand that such information is also Confidential Information. I further understand that Confidential Information does not include any of the foregoing items that has become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved.

**(b)     Former Employer Information.** I agree that I will not, during my employment with the Company, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or any other person or entity and that I will not bring onto the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

**3.     INVENTIONS**

**(a)     Inventions Retained and Licensed.** I have attached hereto, as Exhibit A, a list describing all inventions, original works of authorship, developments, improvements, and trade secrets that I have, alone or jointly with others, conceived, developed or reduced to practice or caused to be conceived, developed or reduced to practice prior to the commencement of my employment with the Company, that I consider to be my property or the property of third parties and that I wish to have excluded from the scope of this Agreement (whether included on Exhibit A or not, collectively referred to as "Prior Inventions"). If no such list is attached, I represent that there are no such Prior Inventions. If disclosure of any such Prior Invention would cause me to violate any prior confidentiality agreement, I understand that I am not to list such Prior Invention in Exhibit A but am only to disclose a cursory name for each such invention, a listing of the party(ies) to whom it belongs and the fact that full disclosure as

1



to such inventions has not been made for the reason. If in the course of my employment with the Company, I incorporate into the Company product, process or machine a Prior Invention owned by me or in which I have an interest, the Company is hereby granted and will have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license, with the right to grant sublicenses, to make, have made, modify, use, sell, distribute and otherwise exploit such Prior Invention as part of or in connection with such product, process or machine. Notwithstanding the foregoing, I agree that I will not incorporate or permit to be incorporated, Prior Inventions in any Company product, process or machine without the Company's prior written consent.

        **(b)**     **Assignment of Inventions.** I agree that I will promptly make full written disclosure to the Company, and will hold in trust for the sole right and benefit of the Company, and that I hereby assign to the Company, or its designee, all my right, title, and interest in and to any and all inventions, works of authorship, mask works, ideas, processes, formulas, source and object code, data, programs, discoveries, know-how, designs, techniques, developments, concept, improvements or trade secrets, whether or not patentable or registerable under patent, copyright, trademark or similar laws, that I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived, developed or reduced to practice, during the period of time I am in the employ of the Company (collectively referred to as "Inventions"), except as provided in Section 3(e) below. I further acknowledge that all original works of authorship that are made by me (solely or jointly with others) within the scope of and during the period of my employment with the Company and that are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act.

        **(c)**     **Maintenance of Records.** I agree to keep and maintain adequate and current written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company. The records will be in the form of notes, sketches, drawings, and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

        **(d)**     **Patent and Copyright Registration.** I agree to assist Company, or its designee, at the Company's expense, in every way to secure the Company's rights in the Inventions and any copyrights, patents, trademarks, mask work rights or other intellectual property rights relating thereto, in any and all countries, including disclosing to the Company all pertinent information and data with respect thereto, and executing all applications, specifications, oaths, assignments and all other instruments that the Company shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, trademarks, mask work rights or other intellectual property rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers will continue after the termination of this Agreement.

        If the Company is unable because of my mental or physical incapacity or for any other reason to secure my signature on any document needed in connection with the actions specified in the preceding paragraph, I hereby irrevocably designate and appoint to the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such documents and to do all other lawfully permitted acts to further the purposes of the preceding paragraph with the same legal force and effect as if executed by me. I hereby waive and quitclaim to the Company any and all claims, of any nature whatsoever, which I now or may hereafter have for infringement of any patent, copyright, mask work, trademark or other intellectual property rights assigned hereunder to the Company.

2

      (e)    **Exception to Assignments.** I understand that the provisions of this Agreement requiring assignment of Inventions to the do not apply to any invention that qualifies fully under the provisions of the California Labor Code Section 2870 (attached hereto as <u>Exhibit B</u>) ("Section 2870"). I have reviewed the notification on <u>Exhibit B</u> and agree that my signature acknowledges receipt of the notification. I will advise the Company promptly in writing of any inventions that I believe meet the criteria in Section 2870 and that are not otherwise disclosed on <u>Exhibit A</u>.

      (f)    **Obligation to Keep Company Informed.** During the period of my employment and for six (6) months after termination of my employment with the Company, I will promptly disclose to the Company fully and in writing all Inventions authored, conceived or reduced to practice by me, either alone or jointly with others. In addition, I will promptly disclose to the Company all patent applications filed by me or on my behalf within a year after termination of employment. At the time of each such disclosure, I will advise the Company in writing of any Inventions that I believe fully qualify for protection under Section 2870; and I will at that time provide to the Company in writing all evidence necessary to substantiate that belief. The Company will keep in confidence and will not use for any purpose or disclose to third parties without my consent any confidential information disclosed in writing to the Company pursuant to this Agreement relating to Inventions that qualify fully for protection under the provisions of Section 2870. I will preserve the confidentiality of any Invention that does not fully qualify for protection under Section 2870.

    **4.**    **CONFLICTING EMPLOYMENT.** I agree that, during the term of my employment with the Company, I will not engage in any other employment, occupation, consulting or other business activity directly related to the business in which the Company is now involved or becomes involved during the term of my employment, nor will I engage in any other activities that conflict with my obligations to the Company.

    **5.**    **RETURNING COMPANY DOCUMENTS.** I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by me pursuant to my employment with the Company or otherwise belonging to the Company, its successors or assigns.

    **6.**    **SOLICITATION OF EMPLOYEES OR CUSTOMERS.** For a period of twelve (12) months following the date Employee ceases to be employed by the Company for any reason, Employee, directly or indirectly, will not: (i) solicit, induce, influence or encourage any person to leave employment with the Company or its resellers or distributors or (ii) harass or disparage the Company or its employees, clients, directors or agents. For a period of twelve (12) months following the date Employee ceases to be employed by the Company for any reason, Employee, directly or indirectly, will not solicit any of the Company's customers or users who were customers or users at any time during Employee's employment with the Company.

    **7.**    **NON-COMPETE.** During the Employment Term, Employee, directly or indirectly, whether as employee, owner, sole proprietor, partner, director, member, consultant, agent, founder, co-venturer or otherwise, will not engage, participate or invest in any business activity anywhere in the world which develops, manufactures or markets products or performs services which are competitive with the products or services of the Company or products or services which the Company has under development or which are the subject of active planning.

    **8.**    **REPRESENTATIONS.** I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I represent that my performance of all the terms of this

Agreement and as an employee of the Company does not and will not breach any agreements to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment by the Company. I have not entered into, and I agree I will not enter into, any oral or written agreement in conflict herewith.

       **9.**    **LEGAL AND EQUITABLE REMEDIES.** Because my services are personal and unique and because I may have access to and become acquainted with the Confidential Information of the Company, the Company shall have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that the Company may have for a breach of this Agreement.

       **10.**    **NOTIFICATION OF NEW EMPLOYER.** In the event that I leave the employ of the Company, I hereby consent to the notification of my new employer of my rights and obligations under this Agreement.

       **11.**    **GENERAL PROVISIONS**

       **(a)**    **Governing Law; Consent to Personal Jurisdiction.** This Agreement will be governed by and construed according to the laws of the State of California, as such laws are applied to agreements entered into and to be performed entirely within California between California residents. I hereby expressly consent to the exclusive jurisdiction and venue of the state courts in Santa Clara County, California or the federal court for the Northern District of California for any lawsuit arising from or relating to this Agreement.

       **(b)**    **Survival.** The provisions of this Agreement shall survive the termination of my employment and the assignment of this Agreement by the Company to any successor in interest or other assignee.

       **(c)**    **Employment.** I agree and understand that nothing in this Agreement shall confer any right with respect to continuation of employment by the Company, nor shall it interfere in any way with my right or the Company's right to terminate my employment at any time, with or without cause.

       **(d)**    **Waiver.** No waiver by the Company of any breach of this Agreement shall be a waiver of any preceding or succeeding breach. No waiver by the Company of any right under this Agreement shall be construed as a waiver of any other right. The Company shall not be required to give notice to enforce strict adherence to all terms of this Agreement.

       **(e)**    **Severability.** If one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

       **(f)**    **Successors and Assigns.** This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns.

       **(g)**    **Entire Agreement.** The obligations pursuant to Sections 2 and 3 of this Agreement shall apply to any time during which I was previously engaged, or am in the future engaged, by the Company as a consultant if no other agreement governs nondisclosure and assignment of inventions during such period. This Agreement is the final, complete and exclusive agreement of the parties with respect to the subject matter hereof and supersedes and merges all prior discussions between

us. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing and signed by the party to be charged. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

This Agreement shall be effective as of the first day of my employment with the Company, namely _February 1_, 200_8_.

_____
Signature

_Donald G. Basile_
Name of Employee (typed or printed)

Witnessed by:

_____
Fusion Multisystems, Inc. Witness

5

**EXHIBIT A**

**LIST OF PRIOR INVENTIONS
AND WORKS OF AUTHORSHIP**

**TO:**     **Fusion Multisystems, Inc.**

**FROM:**     Donald Basile

**DATE:**     2/13/08

**SUBJECT: Previous Inventions**

1.      Except as listed in Section 2 below, the following is a complete list of all inventions or improvements relevant to the subject matter of my employment by Company that have been made or conceived or first reduced to practice by me alone or jointly with others prior to my engagement by the Company:

☐      No inventions or improvements.

☐      See below:

_____

_____

_____

☐      Additional sheets attached.

2.      Due to a prior confidentiality agreement, I cannot complete the disclosure under Section 1 above with respect to inventions or improvements generally listed below, the proprietary rights and duty of confidentiality with respect to which I owe to the following party(ies):

| | Invention or Improvement | Party(ies) | Relationship |
|---|---|---|---|
| 1. | Healthcare Software and IT | United Health Group | |
| 2. | Networking Software & Hardware, AT&T | | |
| 3. | Computer Systems & Enterprise Software, IBM | | |

☒      Additional sheets attached.

Signature of Employee: _____

Print Name of Employee:   Donald G Basile

Date:   3/11/08

6

| Invention or Improvement | Party(ies) | Relationship |
|---|---|---|

4.      Cable Systems,Software & Hardware,      Lenfest Communications, Lenfest Group

5.      Broadband Networking & Communications & Software,      Raza Foundries, Raza Microelectronics, Raza Venture Management

6.      Network Security, IT Software & Hardware,      Sanctuary Networks, Inc., Krypton Investments, LLC, Palisades Venture Partners

Donald G. Basile

3/13/08

7

**EXHIBIT B**

**CALIFORNIA LABOR CODE SECTION 2870**
**EMPLOYMENT AGREEMENTS; ASSIGNMENT OF RIGHTS**

"(a)     Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)     Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer.

(2)     Result from any work performed by the employee for the employer.

(b)     To the extent a provision in an employment agreement purports to require an employee to assign an invention or otherwise excluded from being required to be assigned under a subdivision (a), the provision is against the public policy of this state and is unenforceable."

I acknowledge receipt of a copy of this notification.

_____
Signature

Donald G. Basile
Name of Employee (typed or printed)

Witnessed by:

_____
Fusion Multisystems, Inc. Witness

8